Morning. May it please the court. I'm appearing on behalf of Victor Mason and I am Nathan Mammon. I'd like to begin with the Fifth Amendment issue first. It's undisputed by the government that in its closing argument it asked the jury to conclude that Mason was guilty because Mason was not recorded by Trooper Swickard as denying knowledge of 10 kilograms of cocaine in his car. The government clearly admits three times in its brief, pages 38, 35, and 33, that its intent in the closing argument was to cause the jury to think about what they would have expected to hear if Mason did not know that there were drugs in his car and if he was innocent. The government's comments on Mason's failure to speak and deny knowledge, which asked the jury to infer guilt based on Mason's post-Miranda silence, was an impermissible comment on that silence and violated his Fifth Amendment rights in the principles set forth in Doyle v. Ohio. Mason's counsel should have objected and should have raised this issue in his direct appeal and their failure to do so was deficient. It was a rather minor part of the whole case, wasn't it? Your Honor, Judge Wilkerson, I submit it wasn't a minor part of the whole case. It occurred at the closing rebuttal part of the argument. The very last thing that the jury heard from any counsel before retiring to deliberate was this statement. I understand that he had been given Miranda warnings? Yes, Your Honor. And he was in the back seat of the car with Mr. Govan? Correct. And the two of them started talking? Govan started talking, Your Honor. I think the evidence is undisputed that Govan was the one who was really initiating the conversation, making most of the statements in the back of the car. But Mason made some statements? Mason did make some statements, correct. So how is the conversation between Mr. Govan and Mr. Mason in the back seat of the car, speaking voluntarily after having been given Miranda warnings, how is that part of a custodial investigation? In other words, what the Edwards case and others say is if the defendant is silent or invokes his right to silence or invokes his right to counsel, you shouldn't keep pushing on and pressing on. But as I understand it, that wasn't what happened here. It was Govan that initiated the conversation, not any law enforcement officers. Correct, Your Honor. So the statements, first of all, let me, I guess, explain that we're not challenging that there was anything permissible about commenting the statements that Mason made in the back of the car. The problem wasn't that the government referenced a statement that Mason made. The government took it too far when it referenced what he did not say. And I don't understand Miranda or Doyle to say that you're only protected from having conversations or having your right to remain silent used against you if you're being asked questions by the law enforcement. But it was all part of an interchange. It was. But the conversation ended, there was a statement in the record that contributes to Mason, that's how drugs work. That was the last statement, and the prosecution referenced that. We're not saying that that reference alone was improper. The prosecution took it too far when they asked the jury to ask about what they did not hear Mason say. And once you start asking about what a defendant did not say, you're also asking, you are saying, commenting on the fact that he remained silent. And Miranda allows you, Miranda is not an all or nothing proposition. Miranda says that you can be selectively silent, you can answer some questions, not all, and Doyle protects that selective invocation of Miranda. I've never understood Doyle to extend so far as that when officers are given Miranda warnings and don't press further with questions, and two suspects initiate conversation among themselves in the back of an automobile, that the government is prohibited from referencing that. And it seems to me you can get it and start splicing it very fine by saying, well, no, there was this period of silence somewhere within the conversation. I mean, this can split some very fine hairs. Judge Wilkinson, I don't believe that there has to be necessarily a break in silence to separate what was said from what was not said to have the indication. I mean, every conversation consists of some periods of silence and some periods of conversation. You know, you do want to have some discernible rules. Right, this splits it fine. But, Your Honor, I think the holding of Doyle, the holding of Miranda, and the other courts of appeals that have applied Doyle have understood that the line is crossed when you're commenting not on what a defendant says or not even using what a defendant says to rebut trial testimony, cross-examination, to cross-examine a defendant, but when you're using what he did not say as evidence of guilt or as proof that this defendant was guilty. And the fact that the government referenced any statement that Mason said is fine. But there's another part of this puzzle that you may be overlooking. Hadn't Mason tried himself to use those taped statements to support his denying any knowledge of cocaine in the trunk of the car? And hadn't he sought to use those taped statements? No, Your Honor. The government does make a suggestion of that in its brief, but if you actually look at what Mason's counsel argued, Mason's counsel was very careful about referencing what Govan said, challenging what Govan said, and challenging the fact that Govan couldn't be believed. But what I'm saying is Mason is using the taped statements to build his own case. Well, certainly. And is the government simply not using them? I mean, this just doesn't seem, I don't understand how this is a Cleen-Doyle violation with this conversation between the two of them and Mason using the taped statements to his own advantage. Well, Your Honor, I would submit that Mason was not using the taped statements, but I don't think that fact matters. I can go along with that.  Even the government referenced what was said back and forth. That's not the Doyle violation. The Doyle violation is where the government went beyond what was recorded and told the jury, asked the jury, think about what you should have heard him say. And once you start asking a jury to decide what was not said by the defendant, they could have referenced what he said. They went the step beyond. If you look at JA-402, they have a very clear transition. They start their transition, ladies and gentlemen, to bring to the next thought where they said, think about the hypothetical here, ladies and gentlemen of the jury. What would you have expected Mason to say if he was innocent? You did not hear that, so therefore you should infer guilt. That is where the Doyle violation occurred. It's not in the fact that they were referencing statements on the tape. They could reference that appropriate, if it was appropriately admitted as were not contained. But my understanding of a classic Doyle violation is when a question is asked, generally by law enforcement, and the defendant refuses, because that goes to the heart of the Fifth Amendment. Law enforcement asks a question. The defendant refuses to respond. And then law enforcement tries to capitalize on the defendant's refusal to respond to their questions and say, look, if he was not guilty, he would have told us. And that has always seemed to me to be the paradigmatic Doyle violation. And it does seem to me a bit different from what we have before us here. Well, you know, Doyle itself recognizes, in a quote, that every post-arrest silence is insolubly ambiguous because of Miranda. So why a defendant doesn't speak, there's ambiguity to it. And any time a government starts referencing what a defendant did not say, you're bringing these Fifth Amendment concerns. Why, you know, in this case, for example, Your Honor mentioned about the conversation with Govan. Govan knew, he testified at trial, he knew he was being taped. Govan admitted that he was saying things in the trooper's car because he knew he was being taped. And I don't understand Doyle, or the cases that have followed Doyle, to draw a line between saying that because this occurred in a conversation, a lack of a conversation, something that someone didn't say to a co-defendant sitting in the back of a patrol car, that that somehow is not protected by his Miranda warnings. Particularly when his co-defendant knew that he was being recorded. So I think the heart of Doyle is to protect the right to remain silent and not to have that used against you in any form, because it's unclear why Mason didn't speak. And here, the statements that Mason made don't point, the prosecution can argue that they show guilt, but they also are consistent with showing innocent behavior as well. You can rebut all that. He could not rebut it, because this was the closing rebuttal argument. This was the last thing that the jury was asked to hear, or asked to think about, before he went to deliberate. The very last thing was this hypothetical, think about what you would have heard if Mason were innocent, what he would have said. There was no opportunity to rebut, which makes the prejudice even stronger here, because, and there's many cases, we cite them in our brief, talking about inappropriate evidence, inappropriate comments on evidence, and the rebuttal part of the government's closing argument is particularly prejudicial, because there is no opportunity to correct that, no opportunity to. There was an extensive trial here, and I guess Govan was the state's chief witness. He was the state's chief witness. And he testified about Mason's involvement with the cocaine, I don't know, I think it was 10 kilograms, in the trunk. Didn't this trial really hinge upon the jury's assessment of Govan's credibility? Well, it did, but there was a problem. Wasn't that the really key? That was the key, and that was the problem with this prosecution's statement, because Govan had, there was problems with his credibility, and even what he said, what he said, whether it proved guilt. And if I may, so according with this. Govan's comments about Mason being aware of the kilograms in the trunk, and whether he had helped to load them in the trunk, and his general involvement, I just thought the case would rise or fall on that assessment of Govan's credibility. If I may point out a few key facts on that, because that was important, but it's also important that Govan was central to the government's case, but Govan didn't carry the weight that the government needed. And these are statements that Govan said at trial that undercut the government's case. If I may just have a prelude to this, in accordance with Collins, and Collins is an issue addressed by the district court here, they had to determine how much of the drugs was attributable to Mason in order to get this mandatory life sentence. They had to show at least five kilograms were attributable to Mason individually. And Govan made that issue of proof difficult. Govan admitted that the drugs came from his source, that's JA-293. Govan put the drugs in the car, that's JA-292. Mason never touched the bag, JA-292. And when asked point blank by the government in the direct examination whether Mason knew there were 10 kilograms in the bag, Govan replied, quote, I don't know if he knew it or not. That's JA-294. And Govan stated repeatedly that he was only assuming that Mason knew what was in the bag. How long did this trial last? We seem to be rehashing a lot of it. How long did this trial last? I believe it lasted a day and a half, maybe two days, as far as the guilt phase of the trial. I believe it was no more than two days. So all this pointed to a very challenging case, at the very least a very challenging case for the government to prove that Mason was individually responsible for those five kilograms, which was necessary to get him to life imprisonment. If they did not prove he had five kilograms or was individually responsible for five kilograms, we'd be looking at a very different sentencing issue for Mason, separate from whether there was enough to prove guilt of the conspiracy itself. So we'd submit that Mason should be this prejudiced Mason and that he should be granted relief on his Fifth Amendment claim. And in the remaining time I have, if I could just turn to the Equal Protection Claim very quickly, I'd like to make two points. First, it's important to remember that this claim was summarily denied by the district court, without an evidentiary hearing. And according, like any appeal of a summary judgment ruling, the facts must be drawn inferences, reasonable inferences of the facts must be drawn in favor of Mason. And second, this court did not address this claim in the direct appeal, although many of the facts were the same. In accordance with Wren, the direct appeal concerned reasonableness of the reasonable suspicion for a traffic stop under the Fourth Amendment. This concerns equal protection, where subjective motivations are key. Subjective motivations were not considered in the direct appeal. And, for example, the panel majority... But what evidence should this court look to in determining whether there was a reasonable probability of a different outcome under the prejudice prong of Strickland? The evidence I would look to is, I mean, it's a success of a motion to suppress. Well, with the equal protection violation... Right, but it's here on a 2255, is it not? Correct, Your Honor. And under Strickland v. Washington, don't we have to find under the prejudice prong that there was a reasonable probability of a different outcome? Correct. And there's no evidence in the record at all that the crouper knew the race of the individual when he stopped the car. Not a shred. Well, there is... You could start at the point... Your Honor, may I continue? You sure may. Okay, thank you, Your Honor. At the time he stopped the car, there's no evidence that he did not know. The evidence is unknown both ways. But at the time, certainly by the time he extended the stop, extended the stop past the time necessary just to issue the window tip violation ticket, that time he obviously knew Mason and Govan's race. In fact, he referenced it in the... I realize you say, well, it's a difference between an objective and a subjective test, but the earlier appeal already established that the delay was reasonable and that it was constitutional, that there was reasonable suspicion on the... and the majority found there was reasonable suspicion to believe that drug activity was afoot, and then when the dog alerted on the trunk, there was probable cause to search the trunk. Now, if an officer is acting with objectively reasonable suspicion and an officer is acting with what a court has found to be objective probable cause, doesn't that lessen the likelihood substantially of a successful legal protection challenge? Your Honor, I understand the Fourth Amendment inquiry to not be looking at what was in the officer's mind. You could only look at what were the facts on the ground as a reasonable observer would see them, and was the officer's actions objectively reasonable based on what someone would observe. Here, the question is, what were Trooper Swickard's motivations for why he did this action? And for example, a fact that I don't understand the panel... You've got some time for rebuttal. Yes, Your Honor. Can I ask you to revisit this on rebuttal? Thank you, Your Honor. Thank you. Mr. May, we'd be pleased to hear your side of it. Yes, sir. Thank you very much. May it please the Court. I think Judge Hudson was exactly right regarding the selective prosecution or selective enforcement claim. There is no evidence that race was known at the time that Mr. Mason was pulled over. Well, didn't the officer say that a lot of people have tenant windows? My observation, too, coming from the deep south, a lot of cars in Florida and down that way on I-20 and all those places have a lot of tenant windows. He admitted that he sort of stops cars based on those who peak his interest. Is that right? Does the record reflect that? Yes, sir. Well, peaking their interest means that he saw them, didn't he? No, sir. It says what peaked his interest is that the tint of the windows violated the Georgia statute. No, no, you're missing the point. A lot of them violate that by observation. He said he stops the ones that peak his interest. Obviously, there has to be something other than the tint. The tint is the dominant factor of it all. The distinguishing factor is what peaks his interest. And that's seeing them, isn't it? No, sir. And I believe that in your footnote, footnote five of your dissent, you comment about how would a trooper even be able to look into the car to see the newspaper on the backseat. I think the very reason why there is tint on the windows is there… Of course, that comment, you know, text without context is pretext. That's after he's talking to them. That's not a reference in terms of what he can see. He talks about what peaks his interest. Yes, sir, and there's nothing in the evidence that it was anything to do with race. Well, that's because we don't have an evidentiary matter as to what about who he stops and how he stops. That's why you have evidentiary hearing. And, for example, in terms of the comments he made, oh, they were spooky, spooky. What was spooky about them before he stopped them? Well, the spooky, spooky came after reasonable suspicion was already established. But is there any evidence that he even knew the race of the occupants of the car when he made the stop? No, sir. That's not the end of the inquiry, the stop. The thing is what he did was for a tinted window, he went over and did his little measurements, whatever that was, and then he started asking them, what did you have for breakfast? Where did you stay? Where are you going? That's the part where he clearly, you do admit that he knew they were black then, right? Yes, sir. Well, the question is why does he take them out of the, as you say, the domain of travel for supposedly tinted windows, and then he needs to know where they had breakfast, did they stay with Little Boo last night and all those things, and go to the next one and try, and then he gets a different answer. There is a conflict in your stories of where you stayed last night. That's the part. It's not just what he knew before he stopped, but what he did after he stopped, when he clearly knew they were black. But there's no evidence that he did that because they were black. I know that because it's not been, that's where the ineffective assistance comes from. Because a good lawyer would have been on notice that there are markers in this case that clearly indicate that there was a reasonable basis for making an inquiry as to whether race did impact his investigation and question. And we need, as they're asking for, an evidentiary hearing so we can get some facts and look at that. So you're begging the question to say there's no evidence at that point, aren't you? No, sir, because the burden is upon the appellant in this case. He must make a showing that of clear and convincing evidence that not only there was effect, i.e. that they were similarly situated people. He has not made that showing. Therefore, the district court was appropriate for denying his claim. There is a two-fold under all this and Armstrong. Similarly situated people? Yes, sir. Well, your evidence, the government's own evidence said a lot of cars have tenant windows. That's the whole point. A lot of cars go. The question is we look at, excuse me, a lot of cars, a lot of cars go through there with tenant windows. So the question is how do you select? How do you cherry-pick? And then once you pick them out, who do you pick to ask these picayune questions? And then you get a difference. I mean, you know, you could very well, your husband and wife could sleep in the same bed and bend together all together and one might say, oh, I think I had ham and eggs last week. The other might say, no, no, I think that was bacon. And so that's a difference in the inquiry because that's what it really was, wasn't it? Because he asked those questions and because he got different answers, he said, ah-ha, there's reasonable suspicion there. Then he goes into the car, does the DMV, and deliberately tells them, I'm calling this in but hold it. Don't even give me the information. I'm holding it. And that's a key factor in the constitutional assessment because we talk about reasonable time. Do you agree that that is manipulation of a very important fact that we use in terms of stops, reasonable time to do what you need to do by you saying, DMV, I'm calling this up but don't give it to me. Hold it. No, sir. You don't agree with that? Isn't it a common practice for a state trooper who's by himself or herself 40 miles for backup to radio into the dispatcher what he has before he gets out of the car and starts engaging in a conversation? Absolutely, especially in this case where we knew that he suspected and had reasonable suspicion, which this court has already found that he did, that criminal activity was at foot. He knew that there was criminal activity at foot. There was industrial strength air freshener in the car so strong that it made him give a headache. The two passengers lied. They lied to him. And he knew that criminal activity was at foot. It was improper for him. We've had an evidentiary hearing on the suppression motion, and both the district court found and the court of appeals found that there was reasonable suspicion to stop the car, that the trooper simply did not unconstitutionally delay or extend the traffic stop, and that the search was supported by probable cause. So you have each of these three stages that a court has looked at and found an objective basis for all three of them for the officer's behavior. And when you look at what an ineffective assistance of counsel claim is all about, I can honestly tell you that 100 out of 100 attorneys would have done just what this attorney did, which was to challenge this conduct on Fourth Amendment grounds, because some of those challenges succeeded, whereas the Armstrong challenge has never succeeded. And so the attorney was not ineffective in taking the route most likely to bear fruit. That's all he did. Maybe, you know, I just question whether ineffective assistance of counsel is the right vehicle to get at the situation when the attorney did represent his client very effectively on the most obvious constitutional claim before it and did a good job. It was thoroughly looked into, both at trial and on appeal. And, you know, if that's ineffective assistance of counsel, then there are an awful lot of subpar lawyers in this circuit, and I don't believe there are. Your Honor, I'd agree with you 100%. Doesn't Armstrong require clear evidence as a threshold matter? Clear and convincing evidence is the standard of both prongs, of both prongs of both effect of similarly situated people and of actual racial animus or bad faith. And in this case, we just don't have that. What about the fact that's common about the way he was conducting himself he felt because he was dealing with an old black man? What's that reference? Yes, sir. It was during the suppression hearing. It was during the suppression hearing, and they asked him. It was out there on the road. That's what he said. What did he mean by that? Well, I believe that he's actually older and out of shape is the key. He says that he didn't believe that the two co-defendants were challenging physically because they were older, out of shape, and he did use the descriptor of black men. But the older and out of shape. What was the point that they were black? I have no idea. It's a descriptor. That's the point is you have no idea, but then you talk about it, and Judge Wilkinson gave you a scenario, and you all agree with that. How do you prove these things? Some of the markers are the fact that you bring these extraneous things like he introduced race into the case himself, the officer, correct? Why was that important that they were black? Well, it's a descriptor, and this court has found in Suarez that a descriptor in and of itself is not enough to get a selective enforcement claim. It's not just a descriptor. He said, I stopped two black men. That's not the case. It's not a descriptor. That was important to him. Why was that important that they were black? You don't know, do you? No, sir. But that's what the subjective inquiry is necessary for. And, for example, there's been harping on the fact that the prior case dealt with the Fourth Amendment standard. That's not preclusive. You could have a racial animus and still have a very objective Fourth Amendment basis of a stop. You can come up with it, right? That's what Wren tells us, yes, sir. Absolutely. So that's not dispositive. The question is things like this, which I agree with you. Counsel, you're quite right. I don't know what he meant by that either. They were black. But the issue that we're looking through this selective enforcement claim is through the lens of a 2255. The burden is upon him to show that it would have been dispositive, that there's a reasonable probability the outcome would have been different. My question is if you take that testimony as a whole, was it ineffective on the part of the attorney to look at the testimony, that particular testimony as a whole, and say this officer was simply expressing a concern about being shot, that the question was whether someone was going to come at him physically and have a wrestling match or whether they were going to pull a gun on him. And so you look at the passage, and if you take it as a whole, the trooper was – it wasn't ineffective for a lawyer to look at that and think this probably is not going to succeed because this trooper is expressing a concern about being killed. Absolutely. About being shot. There was absolutely no evidence in the record. I've seen the tape many times. This officer was more than comfortable talking about he interviewed the one while the other one was basically just by himself, didn't interview the other. He did nothing that indicated he was fearful of any of those people. Nothing. Respect – I'm sorry. Is that correct? I disagree with that. What do you disagree about? And Joint Appendix 525. I'm not talking about Joint Appendix. I'm talking about what I can see from my own eyes. Tell me about the video. What did the video show? And that's what I'm telling you. The transcript from the video on Joint Appendix 525, as he's talking to Officer Kitchen, who's coming up, he tells Officer Kitchen, all right, just be ready. This is about to be on. Get ready for it. Just pull up easy. But there is something here. And this court has constantly said that firearms and drug – firearms are the tool of trade of drug traffickers. He knew that – he had reasonable suspicion to believe there were drugs in the car and that these guys were lying to him. He knew that there was something there that this court has already found, that he had reasonable suspicion to believe that criminal activity was afoot, and he was trying to protect himself because – When he first called Kitchen, what had they done for probable cause that made him think that these people had drugs? When he first called Kitchen, what had they done? When he first called Kitchen, the overwhelming smell of the air freshener. Judge, people have air freshener in their car? It only costs about a dollar apiece. That's not what we had. What the evidence shows is there were commercial blocks of air freshener, at least two of them, placed under the seat. He testified they were so powerful that they would give a person in the car a headache to even sit in that car. That's what I didn't hear that last. That he testified that they were so powerful that they would have given any passenger in the car a headache. And that's to cover the smell of drugs. Cocaine is a very pungent-smelling drug. Between that, the go-vans demeanor, the no luggage in the interior, a single key. No luggage in the interior. I don't drive around with luggage in my backseat either. Well, I guess I'm a black man with no luggage. I get stopped too. No, sir. What's the point? You don't have luggage in your backseat. Well, this is one of the things that he believed established reasonable suspicion, which this court has already found there was reasonable suspicion that criminal activity was afoot. But, again, we're looking at this through the prism of an ineffective assistance of counsel claim. And if a lawyer can say the Armstrong challenge is going to be very difficult because what I have here before me is an officer who has some reasonable belief that drug traffic is occurring. He's concerned about his personal safety and wants to call backup, which officers often do in a situation in which they are fearful, might get out of control. He wants to call backup both to protect himself and also, I suspect, to calm a situation down and prevent further difficulties from occurring. Now, the question is, is it ineffective for a lawyer not to bring an Armstrong challenge, given that situation, but to pursue the Fourth Amendment claim? That's the point. That's the question. Absolutely. It's not ineffective. Moreover, she also did not have any evidence that similarly situated people. Armstrong has the two prongs that he must meet both by clear and convincing evidence. There is no evidence of any similarly situated person. So she was not even entitled for a discovery motion at that time because that's what Olvis tells us. Olvis tells us that there at least must be some evidence that there is selective enforcement. There is none here. There is absolutely no evidence in the Joint Appendix or the record to establish selective enforcement, I mean to establish the effect prong of Armstrong. There's no evidence in this record that he called Kitchen for backup. He called Kitchen because Kitchen had the dog. He stated in his testimony that he called him for backup, but he normally works with a partner. That partner was not there. So he called a person. Didn't Kitchen have the dog? He did. And didn't he say that, listen, I'm finishing up with somebody. I said, look, bring the dog. He needed the dog. He said, I'm getting in that car. Didn't he say that? That's not what he said, no, sir. All right. Okay. I know the record pretty well. And he said, I'm getting in that car. He didn't say that? No, sir. Didn't he explain during trial that he made two requests? First of all, he requested backup because he knew Kitchen was on the road. Kitchen is a motor vehicle inspector. He's not a trooper. But he needed the help, wanted somebody there. And then he later said, make sure to get up here with that dog. Yes, sir. Two separate requests, am I correct? Two separate requests. And they show the difference between that he was fearful of officer safety, and then he also had reasonable suspicion that criminal activity was afoot. Okay. The problem is that these cases are very difficult. And that's what the situation is. It's not accusing the officer. Everybody's talking about the officer. It's about inquiry in terms of these cases. Armstrong, it is difficult. But you can never go any further if all you say is that, well, you can't prove it. Most people don't raise their hand up and say, oh, yeah, this is why I stopped someone. It takes some inquiry. And the question is, you talk about counsel. I did practice law and criminal defense for a long time. You got a person facing life in prison, and you don't make an inquiry like this in cases like this? No, sir. And I was a criminal defense attorney for five years as well. And I have no idea when she should have stood up and said, we have an issue. At what point should she have stood up? This court tells us in Roan that we look at it through the perspective of the trial attorney. This is not looking back in the vacuum of hindsight, where an appellant's counsel can pull out three sentences in over 540 pages. I mean, the point is, with respect to my fine colleague's point about inquiry, it isn't as if this activity was swept under the rug. There was intense inquiry. The lawyer raised a Fourth Amendment claim and challenged the officer's actions at every step. There was an evidentiary hearing held. An appellate court went through the arguments, had a good colloquy. The appellate court aired the issue in detail. And it wasn't as if counsel just went to sleep on the sidelines. He pushed it, or she pushed it. And there was inquiry. And it was pressed. And the case also went to trial. And we're not talking about glossing over behavior or not inquiring into what happened here. This incident was examined in minute detail. That's absolutely correct, as well as an inquiry that, Judge Gregory, that you're asking for does not establish Strickland. Strickland must, it's his burden to show that there is a reasonable probability, but for counsel's ineffectiveness, that there would have been a different outcome. The very fact that he's requesting additional discovery shows that he can't meet that burden. He did not put forward any similar situated people. And I have one minute to go. If I can address the Dole violation briefly, I would like to, unless y'all have additional questions on the selective enforcement. Judge, do you have additional questions? I would ask you to look at what was said during closing arguments. First, what Mr. Mason's attorney says is, listen to the words, ladies and gentlemen. She implored the jury to look at the conversation. In reply, the AUSA says, do you really think that's how the conversation would have gone? The conversation is what he was talking about. He was juxtaposing with what the conversation that did occur, that's how drugs go, with how a conversation would have gone if Mr. Mason had not met. The problem is that conversation is informed by Miranda rights. That might be the case. If they were sitting around talking in general, wouldn't it have to be informed by those constitutional rights that were just read in terms of what you would say? And then to say, oh, yeah, what would your conversation be if you had? But that's a different matter. Suppose he had said, do you have a stick of gum? And that's all he said. You would say then, well, wouldn't you have said something different? You would have asked for a stick of gum. Otherwise, you're punishing him for being smart. No, sir. You're not? No, sir. And this court in Rhodes and Wright have said that Miranda does not protect spontaneous statements. This is a conversation between two co-defendants in the back of the car. And the defense attorney implored the jury to look at the conversation. It is proper for the government to respond. Moreover, but that's different, though. You're right. They could look at what he said and examine it and take it for evidence. The problem is you pointing them to the gap. Look at what he did not say and examine that and say he's guilty because he remained silent or did not make a consistent comment about what was said to him. Not just saying in this conversation he admitted that. That's fair game. You're right. But going further, what you said point to having been informed about it's important that you have a right to be silent about anything related to this stop and this arrest. And then you say, well, his conversation was different and it's different because he's guilty. Maybe it's different because he's been given his constitutional rights. And what you're doing, it's different than Boyle, but in a sense it boils down to Doyle. But it's the same essence, isn't it? No, sir, it's not. Why not? Because this was not done in custodial interrogation. What we have is two co-defendants in the back seat of the car. They're talking about how they got stopped, why they got stopped, and then as the cocaine is being piled on the front of the car, over $300,000 worth of cocaine is being put on the front of the car. Mr. Mason says that's how drugs work. It is a comment not upon silence. It's a comment upon the conversation. I'll be happy to answer any other questions, but I see that I'm out of time. Is it the case in Rhode Island versus Ennis that Miranda applies to police initiated interrogation designed to elicit incriminating responses? Absolutely, and this was not police initiated. Okay. And what was the recording for? What did they put the recorder on for? What was their purpose? I do not know. Judge, do you have some more questions? No. All right, we thank you. Thank you very much, sir. And we'd like to hear from Mr. Mammon and Roboto. Thank you, Your Honor. Counsel, the counsel has been extolled to a great deal how great they did a job. Tell us why you're here in terms of you agree that the counsel did a great job, admirable job. Well, Your Honor, addressing the Armstrong challenge, what it would take to raise an Armstrong challenge, first of all, my friend on the other side mentioned that there's no evidence of similarly situated people who have not been stopped. I don't think if we cite cases from the Second Circuit and the Sixth Circuit that point out that when there's direct evidence of race, that takes the place of trying to find that, you know, this is a selective enforcement of, you know, only 90% of African-Americans are being stopped versus 10% of whites. So we have direct evidence of race. When Troopers Wykerd said, the reason I called dispatch was because these are older black men and I feared that we'd be shooting it out. So we have that direct evidence. The second thing. I don't think that counsel was obliged to interpret it that way. When you look, I don't see how counsel could have been ineffective by looking at that conversation as a whole and saying my concern was that they were going to pull a gun on me. And that was the, that's the reason that offices asked to back up. It's, it is a, counsel could feel that it was a very difficult and perhaps even frightening thing to be alone on the side of an interstate highway by yourself and run the risk of having a gun pulled on you and perhaps used on you. And so he's, the lawyer in this case could reasonably assume that he was asking for backup simply in an effort to assure his physical safety. It's what officers do all the time. And a lawyer could take that conversation as a whole. And I think there's difficulty in trying to pick this strand or that strand. When you take it as a whole, isn't this an example of an officer who a court has found reasonably suspected drug activity occurring and called for backup in order to try to and keep it from spinning out of control to the detriment of everyone involved? Your Honor, certainly an officer can call for backup out of concern for safety. We're not arguing with that premise. It certainly happens, but I would submit that the question here is that what happened here? And if you watch the video, as Judge Gregory mentioned, I've seen, I'm sure your honors have watched it as well. You watch the video. Is there anything that Trooper Swiker did that indicates he was fearful or concerned who wanted to make sure he was protected? He separated them. He never asked if they had weapons when he first stopped them. He separated them, left one in the car, one in the back. If he was fearful, truly he could have been fearful. He says, I felt like if they had a gun, we were probably fixing to shoot it out. And then you would have had. Because they were black. Had that happened, we all know and deplore the kind of difficulties that arise when officers act too precipitously with resorts to their firearms. And what I think this statement is saying is, I want to forestall that. I want to prevent that. I don't want another situation where somebody, where an officer draws a gun on a suspect unjustifiably. It happens too often where police use officers, where police use firearms unjustifiably. And this officer, I think, was trying to prevent that very thing. But your honor, there are several things that are inconsistent with him trying to prevent that. I accept that that is a proper motive, and that could have been a proper motive. But why would he have separated them? Why would he have completed the traffic stop? He completed the window tint violation before Trooper Swickert arrived. If he was really fearful, I don't know what his fears were, but if he truly was fearful of his safety, he could have waited for Trooper Kitchens to arrive before he actually did the stop. He took a lot of steps that were inconsistent with his later, and this, certainly officer safety is important. But we should also remember, this is what he said after the stop, why he justified the stop afterwards. And so I think that is important to remember, the perspective of someone who's justifying the stop, and there's certainly no better way to justify a stop. I will submit there's no better way to justify a stop or waiting for backup than safety, because that is such an important concern. But your entire argument is based upon total speculation. There's no evidence to record to support that theory. Your Honor, we know that he said the reason he called for backup was because they were older black men. That's our argument. He called for backup and explained to the dispatcher what he had, which is what any trooper would do, would he not? Certainly. But why did he say, hold it? He said, I'm going to, why did he say, hold it? If he was concerned for safety, he should have run it. Do these people, it seems legitimate that if he was concerned about his safety, let me figure out if these people have outstanding warrants for violent backup arrives. He didn't do that. Would that be more important to advise the dispatcher who you have in case something happens to you and another officer has got to respond? Isn't that more important than sitting there in the car for three or four minutes while the dispatcher runs a check? Certainly. I'm not saying that, uh, that he, those aren't inconsistent. I mean, he, he said, it doesn't make sense why he said, hold them. He could have said, here's two names. I want you to have run it. Judge Hudson's question. Isn't an officer obliged to describe a situation? Well, he is. We're not, we're not disputing that there was anything inappropriate about him calling dispatch. I think that was entirely right. The question is, why did he say twice to call the dispatcher? Isn't an officer obliged to describe to the dispatcher or to a backup situation so that the simply as a matter when the backup arrives or the dispatcher arrives, they will know exactly what, you know, a little bit about what they're confronting. Now he doesn't have a whole lot of time, but if we're going to, if we, if we get into the situation of where an accurate description of a, of a roadside, um, stop and potential confrontation is impermissible and it was ineffective of a lawyer not to raise it. Um, I think that has significant consequences. Your Honor, if I, if I think I understand the direction of your question, if I may, I know I'm over time. I hope if I may respond, certainly the, the, certainly the officer could have said, I don't know that we would be disputing if the officer described Mason and Govan described their height described that they were black. I don't think that would be an issue. He did not do that in his call to dispatch. The description of the reason he called dispatch of them being older black men didn't occur until the suppression hearing when he was explaining why he called dispatch, right? That's my understanding that he wasn't calling in a situation. He didn't mention they were black kitchen. And certainly it would have been fine for him to, I think it was entirely appropriate and probably great police practice for him to call dispatch. Here's the info on these guys, uh, you know, run it, find out if these people, two people have outstanding warrants, uh, for arrest. If they've been involved in a violent crime elsewhere, if they are, there are any bolos looking for these people, that's all relevant information. If you are really concerned about your safety and want to know who these people are, but if you're not concerned about your safety, but you want to extend the stop and you don't want to hear that there is no information on these people, you say, hold it, hold this information. I can just say that these are, these are very difficult situations on all sides. And the whole thing we're trying to achieve is some reasonable enforcement of traffic safety laws and, and, and drug laws. And at the same time, um, avoid the kind of confrontations and shooting and unjustified use of weapons that we all deplore. And it seemed to me this, this officer was trying to thread that line and prevent something really impulsive or drastic on his part from occurring. And then when you add the additional element, was the attorney wrong in going after the officer? He should have gone after the officer. The officer's conduct should have been challenged. But again, a hundred out of a hundred attorneys would have pursued the Fourth Amendment route and the Armstrong route rather than the Armstrong route. Now you say, well, it's not, we're not one rather than the other. But the reason we pay lawyers is because we have them select the claims that are most probable and that are most likely to succeed. They're not expected to bring every claim under the sun. Um, and the officer brought the, I mean, the lawyer brought the claim and brought it effectively. And there's no challenge to his fourth, to his argument on the Fourth Amendment claim. There's no ineffectiveness challenge to his performance on the Fourth, um, on the Fourth Amendment claim. As a matter of fact, the lawyer didn't even really challenge the stop. It wasn't a challenge really just whether or not the dog was a proper, the dog. You know, I'm not nearly as familiar with the direct appeal as I'm sure you are. I think that there was a challenge to the reasonableness of the stop and then the extension of the stop. I understood there'd be two challenges involved. Uh, to Judge Wilkinson's point, sir, if I may close, I guess with this, I think this is the reason why we have the challenge of the stop on the 10th. Oh, correct. Correct. Correct. Uh, if I may close with this, I think this is the reason why we have evidentiary hearings. There's a question of was counsel reasonable. He may have been, you know, she may have had a reason for not doing something that would have been brought out in an evidentiary hearing. What did Trooper Swickard mean when he said the reason he, he stopped these two individuals or called for dispatch that could be addressed in evidentiary hearing. There's a lot of questions that could be addressed in evidentiary hearing. And the, and the issue is, you know, Armstrong challenges are very difficult, but it should be, should it be impossible that these challenges could be brought or raised? And, and I think the evidentiary hearing is critical for a full and proper airing of these facts. All right. Well, I want to, uh, thank you, uh, Mr. Mammon for your, your court appointed. Yes, um, I think you did a wonderful job and we really appreciate the vigor with which you brought your argument and represented your client. And we'd like to come down and greet all of you and then, um, recess and have a, a reconstituted panel. Thank you. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Henry E. Hudson